Slip Op. 04-87

# UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE: CARMAN, JUDGE

| | | |
|---|---|---|
| | : | |
| BASF CORPORATION, | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| v. | : | **Court No. 02-00260** |
| | : | |
| UNITED STATES, | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

[Defendant's motion for summary judgment is denied. Plaintiff's Motion for Leave to File a Sur-Reply Brief is Denied.]

Dated: July 15, 2004

*Barnes, Richardson & Colburn* (*Frederic D. Van Arnam, Jr.*), New York, N.Y., for Plaintiff.

*Peter D. Keisler*, Assistant Attorney General; *Barbara S. Williams*, Attorney-in-Charge, International Trade Field Office; *Harry A. Valetk*, Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice; *Michael Heydrich*, Attorney, Office of Assistant Chief Counsel, International Trade Litigation, United States Customs and Border Protection, Of Counsel, for Defendant.

## OPINION

**CARMAN, Judge:** Plaintiff BASF Corporation ("BASF") initiated this suit to challenge the United States Customs Service's, now organized as the Bureau of Customs and Border Protection ("Customs"), denial of BASF's protest of the classification of seven entries of PURADD® FD-100. Defendant moves for summary judgment, asserting that no genuine issues of material fact in dispute. BASF opposes Defendant's motion. This court has jurisdiction to review this matter under 28 U.S.C. § 1581(a) (2000). For the reasons detailed below, this Court

denies Defendant's motion for summary judgment. The Court also denies Plaintiff's Motion for Leave to File a Sur-Reply.

## BACKGROUND

This case involves seven entries of PURADD® FD-100, "a clear, colorless liquid containing 53[%] [polyisobutylene amine ("PIBA")] and 47[%] saturated hydrocarbons," which is "commonly used as a component of prepared gasoline additive detergent packages" made between January and August 2000. (Pl.'s Statement of Facts ("Pl.'s Statement") ¶¶ 1, 8.); Def.'s Resp. to Pl.'s Statement of Material Facts ("Def.'s Resp.") ¶¶ 1, 8.[1]) "PIBA is a slightly polymerized polymer that has at least five monomer units and is obtained from isobutene" and is primarily made up of polyisobutylene ("PIB"). (Pl.'s Statement ¶¶ 12-13; Def.'s Resp. ¶¶ 12-13.) The PIBA component of PURADD® FD-100 undergoes the following manufacturing process: "inert saturated hydrocarbons [are added to] the highly reactive polyisobutylene (known as HR PIB or by its trade name Glissopal® 1000) . . . to reduce the viscosity of the HR PIB and to ensure that it may be pumped and stored safely." (Pl.'s Statement ¶¶ 3-4; Def.'s Resp. ¶¶ 3-4.) "After importation, PURADD® FD-100 is blended together with various chemicals to create a fully formulated deposit control additive package." (Pl.'s Statement ¶ 6; Def.'s Resp. ¶ 6.) "PURADD® FD-100 is not sold or used as a prepared additive for gasoline [and] is not referred to as an unfinished or incomplete prepared additive for gasoline by the industry." (Pl.'s Statement ¶¶ 7, 9; Def.'s Resp. ¶¶ 7, 9.)

---

[1] The Court notes that Defendant describes PURADD® FD-100 as consisting of 52% PIBA and 48% saturated hydrocarbons or paraffinic solvent in its memorandum in support of summary judgment and accompanying statement of material facts, as well as its reply.

Customs initially classified the merchandise under subheading 3811.19.00[2] of the Harmonized Tariff Schedule of the United States ("HTSUS"), "Antiknock Preparations: Other." Customs Ruling Letter HQ 9643190 (June 26, 2001) at 1 (Def.'s Ex. E). Customs subsequently revoked the ruling letter which classified the merchandise under 3811.19.00 and reclassified the merchandise as a gasoline detergent additive under subheading 3811.90.00[3], HTSUS. *Id.* BASF requested reconsideration of the revocation and sought classification of the merchandise under subheading 3902.20.50[4], HTSUS, the provision for other polyisobutylene or PIBs. *Id.*

---

[2] Subheading 3811.19.00 provides:

| 3811 | Antiknock preparations, oxidation inhibitors, gum inhibitors, viscosity improvers, anti-corrosive preparations and other prepared additives, for mineral oils (including gasoline) or for other liquids used for the same purposes as mineral oils: |
| | Antiknock Preparations: |
| | * * * |
| 3811.19.00 | Other . . . . . . . . . . . . . . . . . . . 1.5¢/kg + 9.3% |

[3] Subheading 3811.90.00 provides:

| 3811 | Antiknock preparations, oxidation inhibitors, gum inhibitors, viscosity improvers, anti-corrosive preparations and other prepared additives, for mineral oils (including gasoline) or for other liquids used for the same purposes as mineral oils: |
| | * * * |
| 3811.90.00 | Other . . . . . . . . . . . . . . . . . . . . 1.5¢/kg + 9.3% |

[4] Subheading 3902.20.50 provides:

| 3902 | Polymers of propylene or of other olefins, in primary forms: |
| | * * * |
| 3902.20 | Polyisobutylene |
| | * * * |
| 3902.20.50 | Other . . . . . . . . . . . . . . . . . . . . . 6.5% |

**STANDARD OF REVIEW**

Summary judgment will be granted when "the pleadings, depositions, answers to interrogatories, and the admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." USCIT R. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The party moving for summary judgment "bears the burden of demonstrating the absence of all genuine issues of material fact." *Avia Group Int'l v. L.A.Gear California, Inc.*, 853 F.2d 1557, 1561 (Fed. Cir. 1988). The moving party may do this "by producing evidence showing the lack of any genuine issue of material fact." *Black and White Vegetable Co. v. United States,* 125 F. Supp. 2d 531, 536 (Ct. Int'l Trade 2000) (citations omitted).

A party opposing a well-supported motion for summary judgment may not simply rely on its pleading. *Id.* In order to successfully defeat the motion, the party "must show an evidentiary conflict on the record." *Mingus Constructors, Inc. v. United States*, 812 F. 2d 1387, 1390-91 (Fed. Cir. 1987). "[T]he inferences to be drawn from the underlying facts contained in such materials must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *see also Avia Group Int'l*, 853 F.2d at 1560.

"[A]t the summary judgment stage the [Court's] function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Whether a disputed fact is material is identified by the substantive law and whether the finding of that fact might affect the outcome of the suit." *E.I. Dupont de Nemours & Co. v. United States*, 123 F. Supp. 2d 637, 639 (Ct. Int'l Trade 2000) (citing

*Anderson*, 477 U.S. at 248).

PARTIES' CONTENTIONS

I.  *Defendant's Contentions*

Defendant characterizes the matter before the Court as a simple classification case, in which "[t]he parties agree on the chemical characteristics PURADD® FD-100" and its use in the United States, but they do not agree on PURADD® FD-100's classification. ("Def.'s Mem. in Support of Def.'s Mot. for Summ. J. ("Def.'s Mem.") at 12-13; Def.'s Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. ("Def.'s Reply") at 5.) Defendant contends that summary judgment is, therefore, appropriate because there are no genuine issues of material fact in dispute. (Def.'s Reply at 1.)

Defendant describes PURADD® FD-100 as "an 'unfinished' fuel detergent additive, containing [PIBA] – a patented and key ingredient for fuel detergency – marketed as the most important component of fuel detergent additive packages for preventing engine deposits" and alleges that PURADD® FD-100's "sole use in the U.S. is as a fuel detergent additive component." (Def.'s Reply at 1-2.) Defendant asserts that, based on BASF's admissions and its patent for PIBA, both parties agree that PURADD® FD-100 is used "as a detergent active component in making fuel additive packages." (*Id.* at 5; *see also* Def.'s Mem. at 5.) Defendant surmises that the challenges raised by BASF as to the description of PURADD® FD-100 as "an unfinished fuel detergent additive" do not establish the existence of a genuine dispute of material fact, but rather demonstrate a "dispute in legal conclusions" based upon undisputed facts. (Def.'s Reply at 8.)

Defendant asserts that the classification of the merchandise as a gasoline detergent additive is correct "because [PURADD® FD-100] has the properties of a detergent as imported" and its only use in the United States is as a "fuel detergent additive component in a fuel detergent additive package." (Def.'s Mem. at 9.) Defendant offers the following summary of the way in which PURADD® FD-100 is produced: first, PIB polymer is converted to PIBA through a two-step chemical transformation process (*Id.*); second, "[t]he result is a high purity, highly active, chlorine-free, water-white product providing superior intake valve detergency while controlling combustion deposits" (*Id.* (quoting BASF's Website Fuel Additives Product Line Information (Def.'s Ex. F))); finally, saturated hydrocarbons are then added to the PIBA, which results in PURADD® FD-100. (*Id.* (citing Crawford Report at 5 (Def.'s Ex. H)).)

Defendant asserts that after importation, PURADD® FD-100 "is blended with carrier oil, and anti-corrosive and other ingredients to produce a final fuel detergent additive package (PURADD® AP-97) ready for use in today's engines." (Def.'s Reply at 6.) Defendant alleges that "[b]lending [the mixing/adding of other substances to the PURADD® FD-100] does not involve a chemical transformation process, since no new chemical bonds are formed and no existing bonds are broken" and does not alter the character of PIBA, "the active – key – ingredient of PURADD® FD-100." (Def.'s Mem. at 10.) Defendant asserts that this evidence demonstrates that "it is undisputed that PURADD® FD-100's virtually sole use is a component of gasoline detergent additive." (Def.'s Reply at 7.) Defendant notes that information supplied by a BASF employee, Dr. Erich Fehr, BASF's Head of Marketing Fuel Additives Performance Chemicals for Automotive and Oil Industry, during his deposition supports the conclusion that

PURADD® FD-100 is almost exclusively used as a component of gasoline detergent additive. (Def.'s Mem. at 4, 17, 20 (citing Fehr Dep. (Def.'s Ex. I); *see also* Def.'s Reply at 6-7.) Defendant argues that "[e]ven if PURADD® FD-100 cannot be considered a prepared additive in its condition as imported, it is – at the very least – an 'unfinished' prepared additive. (Def. Mem. at 5, 20 (citing Crawford Report at 9 (Def.'s Ex. H)).)

Defendant argues that BASF's assertion that there are issues of material fact because Defendant might have a different understanding of PURADD® FD-100's manufacture is incorrect. (Def.'s Reply at 12.) Defendant asserts that any difference in the parties' recitations of the manufacturing process is "immaterial" to the way in which it is classified and does not give rise to the existence of a dispute in material fact. (*Id.*) Defendant also refutes BASF's assertion that Defendant must establish that PURADD® FD-100 is "'primarily used' as a detergent additive 'as is.'" (*Id.* at 7 (citing Pl.'s Opp'n at 7-11.).) Defendant argues that this is "a fact that neither side is claiming;" moreover, Defendant states that it "do[es] not materially disagree with BASF that PURADD® FD-100 is not 'primarily used' as a detergent additive 'as is.'" (*Id.*)

Defendant states that BASF seeks classification of PURADD® FD-100 as an "other PIB[]" under Heading 3902, HTSUS. (Def.'s Mem. at 6.) Defendant notes that "[w]hile Customs recognized that this provision encompasses the modified polymer PIBA, PURADD® FD-100 is not simply PIBA, but rather, it is a preparation containing PIBA; [and] [t]herefore, it is excluded from Heading 3902." (*Id.*) Defendant refutes BASF's assertion that Defendant has claimed that PURADD® FD-100 is not in primary form as the basis of excluding PURADD® FD-100 from classification under Heading 3902. (*Id.* at 13.) Defendant asserts that the basis for

excluding PURADD® FD-100 from Heading 3902 is provided in Chapter 39's explanatory notes, which "exclude prepared additives for mineral oil from classification under Chapter 3902." (*Id.* (citing Chapter 39, HTSUS, Chapter Note 6, Explanatory Notes).)

Defendant asserts that the affidavit of Dr. Stephano Crema, the evidence that BASF offers to refute several statements of material fact that Defendant contends are not in dispute, "contradict[s] BASF's own evidence and admissions," and, as such, " cannot . . . be offered to create issues of fact." (Def.'s Reply at 3.) Defendant alleges that the Crema Affidavit contradicts the information contained in the depositions of Dr. Fehr and Susan Gardell, the marketing manager of BASF's Automotive and Oil Industry. (*Id.*) Defendant labels the Fehr and Gardell depositions as "admissions of BASF," which "cannot now be contradicted simply because the testimony has proven, in hindsight, inconvenient[] to BASF." (*Id.*)

Defendant challenges BASF's assertion that material facts remain at issue "as to whether PURADD® FD-100 is a prepared additive for gasoline" and BASF's argument that "PURADD® FD-100 is not a preparation because no solvent is added to the PIBA prior to importation." (*Id.* at 4.) Defendant argues that, on the basis of BASF's earlier admissions, it has demonstrated that "the PIBA component of the PURADD® FD-100 is viscous material, and is therefore diluted with a hydrocarbon solvent to facilitate processing, shipment, and storage." (*Id.* (citing Crawford Report at 4 (Def.'s Ex. H)).) Defendant states that BASF is now contradicting its admissions by asserting that solvent is added to PIB, not PIBA, and that the PIB-and-solvent mixture then undergoes a process to make PIBA. (*Id.* (referring to Crema Aff. ¶¶ 5-6).) Defendant states that whether the solvent is added to PIB or to PIBA does not change the fact that "PURADD® FD-

100 is . . . a preparation because . . . it is prepared from highly-reactive PIB and a solvent, and thus, is consistent with the definition of a preparation." (*Id.* at 4-5 (citing WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1790 (1981) (defining "preparation")).) Defendant asserts that because PURADD® FD-100 is a preparation, it "meets the definition of a detergent under the Explanatory Notes." (*Id.* at 5.) Defendant adds that, while its description of the point at which the solvent is added differs from that of BASF's, this difference does not create a genuine issue of material fact. (*Id.*)

Defendant disputes BASF's contention that the Court cannot hold that PURADD® FD-100 is an "unfinished" fuel detergent additive because material facts remain at issue. (*Id.* at 8.) Defendant notes that the three facts that BASF alleges to be at issue are: (1) BASF's contention that PURADD® FD-100 is a "fully finished specialty" chemical; (2) BASF's claim that "PURADD® FD-100 'alone' does not provide the essential character of the final formulated fuel detergent package because synthetic carrier oil is necessary for the final product to function well"; and (3) BASF's assertion that "the fuel industry does not recognize PURADD® FD-100 as unfinished." (*Id.*) Defendant asserts that none of these claims present issues of material fact. (*Id.*) First, Defendant argues that labeling PURADD® FD-100 as a "fully finished specialty chemical" does not impact on the legal determination of whether it is an "unfinished" fuel additive for purposes of classification and this label contradicts BASF's earlier "admissions." (*Id.* at 8-9.)

Second, Defendant contends that BASF's claim that PURADD® FD-100 does not provide the essential character of the fuel detergent package is undermined by "other uncontested

evidence [supporting] the determination that . . . PURADD® FD-100 is an unfinished fuel detergent additive." (*Id.* at 9-10.) Defendant's fuel additive expert, Dr. Crawford, also agrees with the conclusion that PURADD® FD-100 is an "unfinished" detergent additive. (*Id.* at 10.) Defendant observes that BASF, relying on the Crema Affidavit, argues that PURADD® FD-100's characteristics raise issues of material fact regarding Defendant's "unfinished" detergent additive description. (*Id.*) Defendant, however, states that it "do[es] not necessarily disagree with BASF's statements," and these statements do not contradict the conclusion that "PURADD® FD-100 has the essential character of a fuel additive because of . . . the undisputed detergency role of the PURADD® FD-100 in the finished PURADD® AP-97 package." (*Id.* at 10-11.)

Third, Defendant contends that BASF's assertion that PURADD® FD-100 is not recognized in the fuel industry as "unfinished" rests upon the fact that the fuel industry does not use the term "unfinished." (*Id.* at 11.) Defendant asserts that it "does not dispute that ["unfinished"] is not used in the fuel industry" and this lack of use or understanding of the term "unfinished" in the fuel industry is not relevant to the case. (*Id.*) Rather, Defendant contends, the issue is whether PURADD® FD-100 is "unfinished" under the HTSUS. (*Id.*)

Finally, Defendant argues that BASF's reliance on *Jack A. Erdle v. United States*, 23 Ct. Int'l Trade 14 (1999), is misplaced. (*Id.* at 11.) Defendant notes that in that case, summary judgment was denied to both parties because the court was "unable to determine whether the merchandise [was] a complete or finished article, or an incomplete and unfinished article having the essential character of a pearl necklace" based upon unclear facts surrounding the stringing, knotting, and clasp design of the imported pearls. (*Id.*) Defendant asserts that "there are no

questions regarding the manufacture and use of PURADD® FD-100 or the role of its constituent components." (*Id*. at 12.)

Next, Defendant addresses BASF's challenges to the admissibility of evidence offered in support of Defendant's motion for summary judgment, asserting that these challenges are "baseless." (*Id.* at 13.) Defendant argues that it has cured any alleged admissibility problem presented by the unsigned depositions and an unsworn expert report by providing the Court with "signed copies of [the deposition transcripts of Dr. Fehr, Ms. Gardell, and James Kecham depositions] and a "statement in which Dr. Crawford certifies that his April 26, 2004 statements and conclusions [in his expert report] are true and accurate to the best of his knowledge." (*Id.* at 14 (referring to Def.'s Reply Exs. A and B).) Defendant dismisses BASF's objections to other specific exhibits by noting that these documents were "submitted to Customs [by BASF] at the administrative level" and were "recognized" by witnesses during their depositions or provided by BASF in its response to Defendant's First Set of Interrogatories. (*Id.*)

Defendant concludes, because it has established the lack of material facts at issue, summary judgment should be granted in its favor and this case should be dismissed. (*Id.* at 13.)

## II. *Plaintiff's Contentions*

BASF argues that this case is not ripe for summary judgment, as genuine issues of material fact remain for trial. (Pl.'s Opp'n to Def.'s Mot. for Summ. J ("Pl.'s Opp'n") at 4.) BASF offers the affidavit of Dr. Stefano Crema, BASF's Business Director, Specialty Chemicals for Automotive & Oil Industry, NAFTA Region, and its response to Defendant's First Set of Interrogatories and Request for Production to dispute Defendant's statement of material facts and

demonstrate that there are outstanding issues of material fact in this case.  (*Id.*)  BASF also

charges that Defendant's motion for summary judgment relies on inadmissible evidence, which

leaves an "unsupported motion" when removed from consideration.  (*Id.*)

Plaintiff disputes Defendant's labeling of PURADD® FD-100 as a prepared additive for

gasoline, properly classified under subheading 3811.90.00, HTSUS, and Defendant's

understanding of the characteristics of PURADD® FD-100 and PURADD® FD-100's

manufacture.  (*Id.* at 6.)  BASF asserts that PURADD® FD-100 is not a preparation and does not

meet the Explanatory Notes' definition of "preparation."  (*Id.*)  BASF contends that Defendant's

statement, "PURADD® FD-100 is a 'preparation' or 'preapred additive' in its imported condition

since it is mixed with specific solvents [the saturated hydrocarbons] to allow it to function better

as a detergent," contains incorrect material facts.  (*Id.* (quoting Def.'s Mem. at 18.))  BASF

explains that prior to importation, no solvents are added or blended with PURADD® FD-100 and

no solvent is added to PIBA.  (*Id.* (citing Crema Aff. ¶¶ 5, 6, 16 (Pl.'s Ex. 1)).)  "While

PURADD® FD-100 is a clear, colorless liquid consisting of PIBA in a hydrocarbon solvent, the

solvent is not added to the PIBA.  [BASF's parent company] adds the hydrocarbon solvent to the

Glissopal® 1000, the [PIB] raw material" to reduce its viscosity and facilitate transportation.  (*Id*.

at 6-7 (citing Crema Aff. ¶¶ 5, 6, 16.).)  "Th[e] Glissopal-hydrocarbon solution is then subjected

to the two-step process for manufacturing PIBA."  (*Id.* at 7 (citing Pl.'s Resp. to Def.'s First Set

of Interrogs. and Req. for Produc. ("Pl.'s Interrogs.") 7(a) (Pl.'s Ex. A)).)  The added "solvent

remains throughout the manufacturing process, does not impact the chemical structure of the

[PIB] or the PIBA, and does not enhance in any way the detergency attributes of PIBA."  (*Id*. at 7

(citing Crema Aff. ¶ 6).)

BASF argues that because no solvents are added to or blended with PURADD® FD-100 or PIBA, Defendant's assertion in its statement of material facts not in dispute, that "PIBA is then blended with saturated hydrocarbons forming PURADD® FD-100" is incorrect. (Pl.'s Opp'n at 7 (citing Def.'s Statement ¶ 9).) BASF argues that this inaccuracy "creates a genuine issue of material fact as to when the saturated hydrocarbon solvent is introduced into the product because plaintiff can prove that defendant's alleged factual representation is wrong." (*Id.*) BASF asserts that Defendant's factual inaccuracy raises a genuine issue of material fact undermining Defendant's "preparation" argument, calling into question whether the merchandise is, in fact, a preparation. (*Id.*)

Plaintiff also challengs Defendant's assertion that the merchandise is a prepared additive for gasoline under 3811.90.00, HTSUS, which Plaintiff identifies as a "use" provision. (*Id.*) BASF relies on "use" as defined in Additional U.S. Rules of Interpretation 1(a), which provides that "a tariff classification concluded by use (other than actual use) is to be determined in accordance with the use in the United States at, or immediately prior to, the date of importation, of goods that class or kind to which the imported goods belong, and the controlling use is the principal use." (Pl.'s Opp'n at 7-8.) BASF asserts that the materials upon with Defendant relies to establish that PURADD® FD-100 has a detergency component – BASF marketing literature, the patent for PURADD® FD-100, deposition testimony, and Ullmann's Encyclopedia of Industrial Chemistry – do not satisfy this rule interpreting "use." (*Id.* at 8.) BASF asserts that this evidence "does not establish that the imported product in its imported condition is ever sold or used by [BASF] or any other company for use in gasoline as a prepared additive for gasoline." (*Id.*) BASF argues that it has provided evidence that the merchandise is not used or sold as a

prepared additive for gasoline. (*Id.*) BASF further asserts that evidence establishes that "when PURADD® FD-100 [as imported] alone is used in gasoline the intake valves of automobile engines may under certain conditions stick open, thereby, causing the engine to not start or otherwise fail." (*Id.* at 9 (citing Crema Aff. ¶¶ 14, 18).) BASF asserts that the problem is remedied when PURADD® FD-100 undergoes further modification into a "fully formulated [deposit control additive] package with an appropriate synthetic carrier oil." (*Id.* at 9-10 (citing Crema Aff. ¶ 14).) BASF adds that PURADD® FD-100, while registered as an "additive" with the EPA, "lacks governmental approval for use as a [prepared detergent additive, known in the industry as deposit control additive] package in gasoline." (*Id.* at 10.) BASF explains that "[t]he EPA requires additive manufacturers to <u>certify</u> all detergent additives before those products can be used as gasoline detergents . . . [and] PURADD® FD-100 is not a certified detergent additive and therefore cannot be lawfully used or sold as a prepared additive for gasoline." (*Id.* (citing 40 C.F.R. § 80.161; Crema Aff. ¶¶ 18-19; Pl.'s Second Supplemental Resp. to Def.'s First Set of Interrogs. and Req. for Produc. ("Pl.'s Second Interrogs.") 25(a)).) BASF notes that "[t]he use of PURADD® FD-100 as a detergent additive in gasoline [in its imported condition] would violate the Clean Air Act and the EPA's regulations," which would result in substantial fines for each day of the violation. (*Id.* (citing 40 C.F.R. § 80.172; Crema Aff. ¶ 19).)

BASF also presents evidence to dispute Defendant's assertion that PURADD® FD-100 can be classified as an "unfinished" fuel additive under subheading 3811.90.00 using GRI 2. (*Id.* at 11.) BASF asserts that PURADD® FD-100 is not unfinished, but "a mature, fully finished specialty chemical." (*Id.* (citing Crema Aff. ¶¶ 10, 20).) BASF explains that PURADD® FD-100 does not provide the essential character for a deposit control additive package, as Defendant

asserts. (*Id*.) Thus, BASF offers that "facts are needed to establish essential character." (*Id*.) BASF explains that "[b]y the time the PURADD® FD-100 is processed into a fully formulated deposit control additive package meeting customer specification[s] and EPA certification requirements, it is not longer PURADD® FD-100" and this processing, which results in a new product, occurs after importation. (*Id.* at 12.)

BASF next asserts that there is an issue of material fact in dispute involving the terms "unfinished" and "incomplete." (*Id.*) BASF contends that the parties have differing understandings of "nature and character" PURADD® FD-100, and this difference raises a triable issue of material fact, similar to that found in the *Erdle* case. (*Id.* (citing *Erdle*, 23 Ct. Int'l Trade 14).) BASF explains that in *Erdle,* the parties stipulated to a general description of the subject merchandise, "natural pearls on a string together with an unattached gold clasp," but differed in their understanding of the essential character of the merchandise (*Id.*) BASF explains that the plaintiff "described the merchandise as natural pearl, graded and loosely strung on a single string for convenience of transport," whereas "defendant characterized the merchandise as an unassembled or unfinished necklace made from natural pearls." (*Id.*) BASF notes that the *Erdle* court denied cross-motions for summary judgment, holding that it was "unable to determine whether the merchandise is a complete or finished article, or an incomplete and unfinished article having the essential character of a pearl neckalce." (*Id.* (quoting *Erdle*, 23 Ct. Int'l Trade at 17).) BASF states that the parties in this case similarly agreed to a general description of PURADD® FD-100: "PURADD® FD-100 is a clear colorless liquid." (*Id.*) BASF contends that the parties, however, disagree as to the essential character of the merchandise. (*Id.*) BASF asserts that PURADD® FD-100 as imported is "a complete and finished specialty chemical." (*Id.*) BASF

states that Defendant, on the other hand, is arguing that PURADD® FD-100 "is an incomplete

and unfinished article having the essential character of a prepared additive for gasoline because

after importation it is manufactured into a different product that is used as a prepared additive for

gasoline." (*Id.* at 12-13.)  BASF concludes that this dispute in the characterization and

description of PURADD® FD-100 raises a genuine issue of material fact as to PURADD® FD-

100's essential character.  (*Id.* (citing *Erdle*, 23 Ct. Int'l Trade 14).)

BASF raises a challenge to the admissibility of the evidence that Defendant relies on to

support its motion for summary judgment. (*Id.* at 16.)  Specifically, BASF notes that several of

Defendant's exhibits have not been authenticated, a requirement for admissibility at trial and for

consideration in deciding a motion for summary judgment. (*Id.* at 16-17.)  BASF also challenges

Defendant's use of a report written by Defendant's expert, Dr. Wheeler Crawford.  (*Id.* at 18-19.)

BASF notes that the report is not authenticated, is unattested and contains inadmissible hearsay.

(*Id.* at 18-19.)  Further, BASF notes that it is not an affidavit, as it has not been sworn to, and as

such, is an inadmissible unsworn statement which cannot be relied on in summary judgment.  (*Id.*

at 19-20.)  BASF notes that, at the time Defendant filed its motion for summary judgment, the

depositions of Dr. Erich Fehr, Susan Gardell, and James Ketcham had not been reviewed,

corrected, changed, or signed to attest to the truth and accuracy of the testimony.  (*Id.* at 21-23.)

BASF argues that when these inadmissible pieces of evidence are removed from consideration,

Defendant's motion for summary judgment is unsupported.  (*Id*. at 23.)

### DISCUSSION

**There are Genuine Issues of Material Fact as to Whether PURADD® FD-100 is a Preparation and Whether PURADD® FD-100 is "Unfinished" for Purposes of Classification.**

"[A]t the summary judgment stage, the [Court's] function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Whether a disputed fact is material is identified by the substantive law and whether the finding of fact might affect the outcome of the suit." *E.I. Dupont de Nemours*, 123 F. Supp. 2d at 639. In this case, the parties dispute what PURADD® FD-100 is at the time of importation, what PURADD® FD-100's manufacturing process entails and the significance of that process to classification, and PURADD® FD-100's use at the time of importation. These disputes constitute genuine issues of material fact, rendering summary judgment inappropriate.

The factual disputes are genuine because a reasonable fact finder could return a verdict for either Plaintiff or Defendant, finding that PURADD® FD-100 as imported is a finished specialty chemical or an unfinished detergent additive for gasoline, or that it is a preparation or is not a preparation. Defendant, relying on the Crawford Report and deposition testimony, argues that PURADD® FD-100 is classifiable as a gasoline detergent additive or an unfinished gasoline detergent additive under 3811.90.00, HTSUS, because PURADD® FD-100 "has the properties of a detergent as imported," is an active ingredient in fuel additive packages, and is almost exclusively used as a component of gasoline detergent additive. (Def.'s Mem at 5, 9; Def.'s Reply at 4-13.) Defendent also asserts that PURADD® FD-100 is "preparation" because the addition of solvents to PIBA, results in a "preparation, rather than a polymer 'in primary form.'"

(Def.'s Mem at 27-29.)  Defendant adds that the evidence submitted by BASF and used by Defendant to support its motion for summary judgment contradicts the Crema Affidavit that BASF relies on to oppose Defendant's motion for summary judgment.  (*Id.* at 3.)

BASF counters that its admissible evidence demonstrates that PURADD® FD-100 is neither an unfinished prepared additive for gasoline because, as imported, it is "a complete and finished specialty chemical," nor is PURADD® FD-100 a preparation because "[p]rior to importation . . . , no solvents are added to or otherwise blended with PURADD® FD-100" or PIBA.  (Pl.'s Opp'n at 6-13; Crema Aff (Pl.'s Ex. 1).)  BASF also raises a challenge to the admissibility of several critical pieces of evidence upon which Defendant's motion relies.  (*Id.* at 16-23.)

The Court holds that these factual disputes are genuine because a reasonable fact finder could find that PURADD® FD-100, as imported, is an unfinished gasoline detergent additive or that it is a "mature, fully finished specialty chemical" that does not provide the essential character for a deposit control additive package; a reasonable fact finder could also find that PURADD® FD-100 is a preparation or that it is not a preparation.

These factual disputes are also material because they could affect the outcome of the classification determination.  Characterizing PURADD® FD-100 as an finished or unfinished gasoline detergent additive, or as a "mature, fully finished speciality chemical" that does not provide the essential character for a deposit control additive package would directly affect the classification of PURADD® FD-100.  Finding that the manufacturing process of PURADD® FD-100 results in an imported product that fits the definition of a "preparation" would also directly affect the classification of PURADD® FD-100.  The Court notes that the challenge of the

admissibility of the Crawford Report seems to implicate the need to weigh the unsworn, yet certified, Crawford Report against the Crema Affidavit, a consideration not appropriate for summary judgment determinations.

Further findings of fact are necessary to determine whether PURADD® FD-100 is a preparation and whether PURADD® FD-100 is a finished or an unfinished prepared additive classifiable under 3811.90.00, HTSUS.

### CONCLUSION

For the reasons addressed herein, Defendant's motion for summary judgment is denied. Plaintiff's Motion for Leave to File a Sur-Reply Brief is also denied.

/S/ Gregory W. Carman
Gregory W. Carman
Judge

Dated:  July 15, 2004
New York, NY